## In re VALENCE TECHNOLOGY, INC. SECURITIES LITIGATION.

### No. C–95–20459–JW.

United States District Court,
N.D. California,
San Jose Division.

Nov. 6, 1997.

---

James Caputo, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, Joseph J. Tabacco, Jr., Berman, DeValerio, Pease & Tabacco, San Francisco, CA, for Plaintiffs.

Robert P. Feldman, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, John Missing, Brobeck, Phleger & Harrison, San Francisco, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WARE, District Judge.

### I. INTRODUCTION

This case concerns whether a magazine article about questionable business practices

starts the running of the statute of limitations for a securities fraud action based on those same questionable business practices. On July 14, 1997, Special Master Paul Valentine submitted a Recommendation to grant Defendants' motion for summary judgment on the grounds that Plaintiffs' securities fraud claims are barred by the applicable one-year statute of limitations. Plaintiffs' objections to the Special Master's Recommendation were heard by the Court on September 22, 1997. Patrick Coughlin appeared on behalf of Plaintiffs. Robert Feldman, Tower Snow, John Missing, and James Lico appeared on behalf of Defendants. Based upon all pleadings filed to date, as well as the comments of counsel at the hearing, and after *de novo* review, the Court GRANTS summary judgment in favor of the Defendants.

## II. BACKGROUND

This is a securities class action suit brought on behalf of all persons who purchased the securities of Valence Technology, Inc. ("Valence" or the "Company") between May 7, 1992 and August 10, 1994. Plaintiffs allege violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 against all Defendants and violations of Section 20(a) of the Securities Exchange Act of 1934 against individual Defendants Lev Dawson, Calvin Reed and Carl Berg.

Plaintiffs allege that Defendants made fraudulent misrepresentations concerning the status of the technology and risks attendant to the development of commercial rechargeable lithium polymer batteries for the telecommunication, computer and automotive industry in connection with the initial public offering of the Company in May, 1992, which raised about $33 million, and additional stock offerings on November, 1992 and December 1993, which raised an additional $125 million. Plaintiffs allege that Defendants knew at all times that commercial mass production and usage of the lithium polymer battery was an illusion and that Defendants defrauded investors so that they could obtain millions of dollars in profits through insider sales. For example, Defendant Dawson allegedly sold over two million shares of Valence common stock for proceeds in excess of $40 million. During the relevant time period, Valence stock traded as high as $25.00 per share, and as low as $3.25 per share.

The Special Master recommended that Defendants' motion for summary judgment be granted on the grounds that Plaintiffs' claims are barred by the applicable one-year statute of limitations. In brief, the Special Master reasoned that an article entitled "Story Stock" about Valence published on or about February 15, 1993 in *Forbes* magazine, a national business magazine, disclosed sufficient facts to put a reasonable investor on inquiry notice of possible fraud; that Plaintiffs first complaint was not filed until May 1994, more than one year after the *Forbes* article was published; and therefore Plaintiffs' claims are time barred. The article stated:

> Want to get on the tech stock bandwagon? Here's an exciting company for you: Valence Technology, a San Jose, Calif. outfit that is developing a rechargeable lithium/polymer battery. Valence's battery packs more energy per pound than the well-established nickel/cadmium alternative, and it costs much, much less to manufacture. So says an "independent" scientist who has evaluated the technology. Valence has landed a $100 million order from Motorola—so say new reports. And Valence, though now in the red, will be a thriving company, earning $3.25 a share in 1997. So says a stock analyst report.

> \* \* \* \* \* \*

> And if you believe the story that goes with Valence, you probably don't know about these drawbacks: The Motorola contract is much less than meets the eye; the largest share holder in Valence has been involved in two other Silicon Valley start-ups that failed; and the outside scientist who evaluated the battery just took Valence insiders' word for it in judging manufacturing costs and durability.

> \* \* \* \* \* \*

More important is that investors don't look behind the road show to what is really energizing this stock: a triad that includes insiders unloading shares for a price hundreds of times what they paid, an underwriting firm that pulls in fees for helping them do that, and journalists who are only too willing to take at face value the boastful pronouncements of the company's publicity department.

As an experiment, compare these three documents: a Montgomery securities buy recommendation on the stock from last May, the government-sanctioned prospectus that came out with a 4.6 million-share offering in November, and a Valence press release issued in December. It's sometimes difficult to tell the three documents apart.

The press release, for example, contains a scientific-looking diagram of the lithium/polymer battery, marred by an arithmetic error on the dimensions of the battery's layers. Now look at the bullish report from Montgomery analysts Thomas Lloyd–Butler and Peter McGratty. It contains the same diagram, complete with the same error. And then there's the authoritative prospectus—with the same diagram and the same error.

The Montgomery analysts say that Valence Technology is going to rake in precisely $536,050,000 in revenues in fiscal 1997. How do they know that? Well, the battery will sell like the dickens because it's much more compact and cheaper to make than competing batteries. The manufacturing cost of the Valence battery is going to be only 7 1/2 cents per watt-hour of energy capacity, says the Montgomery report, a tenth the figure for nickel/cadmium batteries, the current standard in computers, telephones and the like. The battery keeps a charge better than nicads, says the report, losing 0.5% of its juice per month, against 5% to 20% for the nicad.

And how do the analysts know all this? They got if from Digby Macdonald, a materials science professor at Penn State, described as an "independent consultant."

How does Macdonald know about the Valence battery's performance and cost? He spent a day watching Valence scientists record measurements. He didn't take away a sample for testing, so he had to take their word for long-term performance measures. The cost projections are also from inside Valence. Independent? Montgomery Securities paid Macdonald for his analysis, but he won't say how much.

\*    \*    \*    \*    \*    \*

What about the Motorola purchase order, which boosted the stock 4 3/8 points when it was announced in December? Look closely. It's not the same as, say, a purchase order from GM for tires. Motorola merely agreed to buy batteries if Valence can make them cheaply and if the batteries work. If they don't work, Motorola isn't on the hook for a dime.

Is Montgomery Securities an independent source? Judge for yourself. Montgomery got the lion's share of $7 million in total underwriting fees for two stock offerings, one last May at 8, and another in November at 18. It may also be earning substantial spreads or commissions for helping insiders dribble out small amounts of their holdings to the public under the Securities & Exchange Commission's Rule 144. Immediately after the November offering, 4.7 million additional insider shares were eligible for sale, subject to Montgomery Securities' permission.

Most of the proceeds from the two underwritings went into Valence's coffers. But the largest shareholder, Carl Berg, with originally 33% of the shares outstanding, unloaded 495,000 of them in November, shares he bought at a penny each. He didn't sell in the first offering, but the company used 56.2 million of the proceeds to repay Berg loans he made to Valence to get the company going.

The prospectus omits some interesting details on Berg, 55, a California real estate developer and high-tech investor. He was a director and significant shareholder in Actrix, a closely held computer maker that went under in the mid–1980s. Berg was also an insider in International Memories, Inc., a hard-drive company. In that capacity he was accused of securities fraud in a

lawsuit filed by Minnesota Mining & Manufacturing Co. in 1978, a case that was eventually settled. IMI shareholders wound up with stock in Corvus Systems; Berg became Corvus' largest shareholder and creditor. Corvus filed for Chapter 11 in 1988. Berg is now the largest shareholder in Integrated Device Technology, a semiconductor firm that lost money in its last fiscal year. It has paid Berg at least $20 million in real estate transactions over the past four years.

The pattern seems to be this: Outside investors may do poorly, but Berg usually gets his money out. Says Berg, "I like big rewards and big risk. Probably no one else would have put their money in [Valence]."

A case can be made that the technology stock rally of the past year still has a way to go (*see* p. 114). Maybe so, but investors ought to be a little choosier.

Special Master's Recommendation, Ex. 2. Following the publication of this article in February 1993, Valence's stock price fell approximately forty percent (40%).

The Special Master acknowledged that much of the inquiry notice of fraud can only be discerned from the tone of the entire article, which reeked with warning. However, the Special Master also outlined several examples of how matters disclosed in "Story Stock" in February 1993 became the gravamen of Plaintiffs' complaint. *See* Recommendation, pp. 14–17.

Plaintiffs contend that the Special Master's conclusions about the article's notice effect as well as the bar standard—inquiry versus actual notice—are not based on applicable law or a complete review of available evidence, and accordingly should not be adopted.

## III. STANDARDS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323–324, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. at 2552–53. If he meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of his case with respect to which he bears the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. at 2552–53.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, i.e., "facts that might affect the outcome of the suit under the governing law ... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986).

The court must "draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 518–22, 111 S.Ct. 2419, 2434–35, 115 L.Ed.2d 447 (1991) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986); *T.W. Elec. Service v. Pacific*

*Elec. Contractors,* 809 F.2d 626, 630 (9th Cir.1987). It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service,* 809 F.2d at 631. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

The Court reviews a Special master's findings and conclusion *de novo. See* Federal Rule of Civil Procedure 53(e)(2); *Estate of Conners by Meredith v. O'Connor,* 6 F.3d 656, 659 (9th Cir.1993). The Court must enter its own order based on such review. *Id.*

## IV. DISCUSSION

There are no disputed material facts. Plaintiffs contend that summary judgment based upon the statute of limitations should be denied because the inquiry notice standard is inapplicable as a matter of law, and because the *Forbes* article did not place Plaintiffs on either inquiry or actual notice of Defendants' alleged fraud.

### A. Inquiry Notice v. Actual Notice

Litigation under Rule 10b–5 "must be commenced within one year after the discovery of the facts constituting the violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 2782–83, 115 L.Ed.2d 321 (1991). The parties dispute whether the *Lampf* decision requires "actual" or "inquiry" notice to trigger the statute of limitations with respect to securities fraud actions. The Ninth Circuit has not yet squarely addressed this issue. However, there is at least one Ninth Circuit opinion which suggests that inquiry notice continues to apply after the *Lampf* decision. *See In re Stac Electronics Securities Litigation,* 89 F.3d 1399 (9th Cir.1996). Furthermore, it appears that every appellate court which has addressed the issue since the Supreme Court's ruling in *Lampf* has held that inquiry notice applies.[1] In the absence of controlling Ninth Circuit authority, this Court adopts the inquiry notice standard for the reasons offered in *Tregenza v. Great American Communications Company,* 12 F.3d 717, 721–22 (7th Cir.1993), *cert. denied* 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994).

Applying the inquiry notice standard, the statute of limitations for a 10b–5 claim begins to run when the plaintiffs have actual knowledge of the fraud *or* knowledge of facts sufficient to put a reasonable person on notice of fraud. *Davis v. Birr, Wilson & Co.,* 839 F.2d 1369, 1370 (9th Cir.1988). "Notice" is provided by "facts that would have caused a reasonable person to suspect the possibility of a misrepresentation or misleading omission." *LaSalle v. Medco Research, Inc.,* 54 F.3d 443, 444 (7th Cir.1995). It is not necessary for plaintiffs to have full knowledge of the existence of a claim or of each allegation in a claim. *Sterlin v. Biomune Systems, Inc.,* 960 F.Supp. 1531, 1535 (D.Utah 1997). Knowledge of facts that would lead a reasonable investor to exercise due diligence in investigating for potential fraud is sufficient. *Robuck v. Dean Witter & Co., Inc.,* 649 F.2d 641 (9th Cir.1980); *Davis v. Birr, Wilson & Co.,* 839 F.2d at 1370. In other words, the statute of limitations is triggered once there are "sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved

1. *Dodds v. Cigna Securities, Inc.,* 12 F.3d 346, 353 (2d Cir.1993), *cert. denied,* 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994); *Menowitz v. Brown,* 991 F.2d 36, 41–42 (2nd Cir.1993); *Howard v. Haddad,* 962 F.2d 328, 330 (4th Cir. 1992); *Tregenza v. Great American Communications Co.,* 12 F.3d 717, 721–22 (7th Cir.1993),

*cert. denied,* 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994); *LaSalle v. Medco Research, Inc.,* 54 F.3d 443, 444 (7th Cir.1995); *Whirlpool Financial Corp. v. GN Holdings, Inc.,* 67 F.3d 605, 609 (7th Cir.1995); *Olcott v. Delaware Flood Co.,* 76 F.3d 1538, 1549 (10th Cir.1996).

in the sale." *Cook v. Avien, Inc.*, 573 F.2d 685, 697 (1st Cir.1978). A reasonable investor is deemed to have knowledge of well publicized and widely available information in the public domain. *Whirlpool Financial Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 610 (7th Cir.1995); *Eckstein v. Balcor Film Investors*, 58 F.3d 1162 (7th Cir.1995); *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1263 (4th Cir.1993); *Sterlin, supra; In re Integrated Resources Real Estate Sec. Lit.*, 815 F.Supp. 620, 639 (S.D.N.Y.1993).

The issue of inquiry notice is often a factual issue for a jury. However, where the underlying facts are undisputed, factually-based issues such as inquiry notice may be decided as a matter of law. *See Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir.1987); *Aizuss v. Commonwealth Equity Trust*, 847 F.Supp. 1482, 1486–87 (E.D.Cal.1993). If it can be determined from the face of the parties' papers that plaintiffs were placed on inquiry notice of the possibility of fraud, and the plaintiffs failed to exercise reasonable diligence in discharging that duty to inquire, the court may impute constructive knowledge of the fraud to the plaintiffs. *Sterlin, supra.*

### B. The Forbes Article

■ Plaintiffs contend that the *Forbes* article did not address the fraud or core allegations concerning Defendants' alleged misrepresentation of the Valence battery's nature, performance or safety characteristics, and therefore the article could not have placed the market on notice of fraud at Valence. As to the battery's nature, Plaintiffs assert that the article did not mention, much less question, one of the central bases for Plaintiffs' suit, namely, whether Valence fraudulently misrepresented that its revolutionary new battery used a solid electrolyte instead of the conventional liquid electrolyte solution. Further, Plaintiffs assert that the article did not address the following additional core allegations concerning the battery's performance: that the Valence battery (1) operated four times longer on a single charge than a standard nickel cadmium ("NiCad") battery of comparable weight, (2) had a total amount of available energy (energy density) of 205 Watt

hours ("Wh")/kg and 383 Wh/1, allowing it to deliver equal power from a battery one-third the volume and one-quarter the weight of today's commonly used rechargeable batteries, and (3) was capable of over 150 deep discharge and 300 partial discharge cycles with no loss of capacity. In sum, Plaintiffs assert that while it is true that the *Forbes* article introduced some skepticism concerning Valence, it is not true the article put Plaintiffs or the market on notice of Defendants' fraudulent characterizations of the battery's electrolyte or its performance capabilities.

However, it is not necessary for Plaintiffs to have full knowledge of the scope of the fraud, the existence of a particular claim or of each allegation in a claim, to be on inquiry notice. *See e.g. Dodds v. Cigna Securities, Inc.*, 12 F.3d 346 (2nd Cir.1993); *Kennedy v. Josephthal & Company*, 814 F.2d 798, 802 (1st Cir.1987); *Sterlin, supra.* Rather, the proper inquiry is whether the *Forbes* article imparted sufficient facts to put a reasonable person on notice of potential fraud. "The information that triggers inquiry notice of the probability of an alleged securities fraud is any financial, legal, or other data available to the plaintiffs providing them with sufficient storm warnings to alert a reasonable person to the probability that there were either misleading statements or significant omissions involved in the sale of securities." *Freedman v. Louisiana–Pacific Corp.*, 922 F.Supp. 377, 395 (D.Or.1996), *quoting In re Integrated Resources Real Estate Sec. Litig.*, 815 F.Supp. 620, 639 (S.D.N.Y.1993) (internal quotations omitted). Notice requires only the disclosure of sufficient facts suggesting fraud to a reasonable investor. *In re General Development Corp. Bond Litig.*, 800 F.Supp. 1128, 1142 (S.D.N.Y.1992).

In this case, the undisputed evidence leads to the inescapable conclusion that the *Forbes* article triggered inquiry notice. The title of the article—"Story Stock"—as well as its substance disclosed the general fraudulent scheme alleged by Plaintiffs in this case: that Defendants made misrepresentations about the Valence battery technology, driving up the stock price so that they could sell their shares at huge profits. The article

opened by asking, "What levitates technology companies on Wall Street? Look at the case of Valence Technology and the curious merry-go-round of insiders, underwriters and journalists that keeps its stock spinning." The article also provided notice of scienter, suggesting that "Insiders," including one "accused of securities fraud" were "unloading shares for a price hundreds of times what they paid," while they were "energizing the stock" of "a company whose main asset ... is an unproven technology."

A comparison of the article and Plaintiffs' complaint further confirms that the market had long been aware of the facts that Plaintiffs contend were fraudulent. For example, the article disclosed that the scientist who evaluated the battery technology was not "independent" as Valence represented, but was paid by Montgomery. The article disclosed that the scientist spent only a day at Valence, that he did not conduct any independent tests, and just took Valence insiders' word regarding certain tests. In their complaint, Plaintiffs allege these very same facts as an indication of fraud.

The article disclosed that the Motorola contract was "much less than meets the eye." In their complaint, Plaintiffs allege that Mr. Dawson fraudulently stated that "the significance of the Motorola contract can't be overestimated." There are many other examples. Indeed, the facts disclosed and charges leveled by Forbes bear nearly a one-to-one correspondence to the allegations of Plaintiffs' original complaint.

Moreover, the Forbes article casted doubt on virtually all of Valence's representations about battery performance. The article highlighted the following representations as based upon unverified data from biased sources: (1) the battery is much more compact and cheaper to make than competing batteries; (2) the manufacturing cost of the Valence battery is going to be only 7 1/2 cents per watt-hour of energy capacity; and (3) the battery keeps a charge better than nicads, says the report, losing 0.5% of its juice per month, against 5% to 20% for the nicad. Thus, the Forbes article was sufficiently fact specific and comprehensive to put a reasonable person on notice of fraud.

### C. Publications After the Forbes Article

Plaintiffs assert that even if the Forbes article provided notice, the period of limitations should not run from the date of that publication because Defendant Dawson later wrote a letter disputing the substance of the Forbes article, and Valence's underwriter, Montgomery Securities, similarly criticized the article. Plaintiffs also cite to five other articles which they contend counteracted the skepticism of the Forbes article. See Valence's Opposition, p. 6. Plaintiffs suggest that these articles so completely counteracted the Forbes article that Valence's stock value actually increased. Furthermore, Plaintiffs emphasize that even after the Forbes article, Valence conducted another successful public offering in December of 1993, which raised $51.5 million. Plaintiffs asserts that these positive market events are inconsistent with market notice of fraud. Plaintiffs also argue in the alternative, that even if the Forbes article triggered inquiry notice, the Plaintiffs' claims are not time barred to the extent they are based upon misrepresentations allegedly made after the Forbes article was published and within one year of the filing of the complaint, even if the alleged misrepresentations related to the same subject matter as the Forbes article. In particular, Plaintiffs contend that claims based upon misrepresentations allegedly made in connection with the December 1993 public offering are not time barred.

■ Plaintiffs' first argument, that subsequent optimistic publications counteracted the effect of the Forbes article and that market increases are inconsistent with fraud, is unavailing. Once the facts constituting inquiry notice are disclosed, "neither reassurances accompanying the relevant notice nor the continued failure to disclose the facts allegedly misrepresented in the first place, relieves the plaintiff of his duty to undertake reasonable inquiry or tolls the statute." Lenz v. Associated Inns & Restaurants Co. of Am., 833 F.Supp. 362, 376, n. 12 (S.D.N.Y. 1993) quoting In re Integrated Resources Real Estate Limited Partnerships Securities Litigation, 815 F.Supp. 620, 640 (S.D.N.Y. 1993). Indeed, if anything, the conflicting

information being put out into the market by *Forbes* and Defendant Dawson should have heightened, not alleviated, a reasonable investor's suspicion of potential fraud.

■ The Court also rejects Plaintiffs' second argument, that the statute of limitations does not bar claims based upon misstatements allegedly made after the *Forbes* article was published and within one year of the filing of the complaint. The allegedly fraudulent scheme was disclosed by the *Forbes* article, even if the alleged scheme continued to be in operation. The logic of *Lenz, supra,* and *Integrated Resources, supra,* dictate that once the *Forbes* article triggered the duty to inquire into potential fraud, that duty was not extinguished by the passage of time or excused by subsequent alleged misstatements by Defendants regarding the same subject matter as the *Forbes* article. Instead, the duty of inquiry continued, and therefore barred any claims based upon same fraudulent scheme described in the *Forbes* article. Stated differently, once the *Forbes* article alerted Plaintiffs of the possibility of fraud, Plaintiffs could not reasonably rely upon any further statements by the Defendants regarding commercial rechargeable lithium polymer batteries. Under these circumstances, the Court finds that all claims set forth in Plaintiffs' complaint are time barred.

## V. CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' motion for summary judgment.