[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 14, 2003
THOMAS  K. KAHN
CLERK

No. 02-11727

D. C. Docket No. 01-02847 CV-FAM

REPUBLIC OF HONDURAS,

Plaintiff-Appellant,

versus

PHILIP MORRIS COMPANIES, INC.,
PHILIP MORRIS USA, INC.,
f.k.a. Phillip Morris Incorporated, et al.,

Defendants-Appellees.

No. 02-11728

D.C. Docket No. 01-05113 CV-FAM

REPUBLIC OF ECUADOR,

Plaintiff-Appellant,

versus

PHILIP MORRIS INTERNATIONAL INCORPORATED,
PHILIP MORRIS COMPANIES INC., et al.

Defendants-Appellees.

_____

No. 02-11733

_____

D.C. Docket No. 01-05115 CV-FAM


REPUBLIC OF BELIZE,

Plaintiff-Appellant,

versus

PHILIP MORRIS INTERNATIONAL, INC.,
PHILIP MORRIS COMPANIES INC., et al.,

Defendants-Appellees.


_____

No. 02-11734

_____

D. C. Docket No. 01-05117 CV-FAM


REPUBLIC OF HONDURAS,

Plaintiff-Appellant,

versus

PHILIP MORRIS INTERNATIONAL, INC.,
PHILIP MORRIS COMPANIES INC., et al.,

Defendants-Appellees.


2

_____

No. 02-11735
_____

D.C. Docket No. 01-01936 CV-FAM

REPUBLIC OF ECUADOR,

Plaintiff-Appellant,

versus

PHILIP MORRIS COMPANIES, INC.,
PHILIP MORRIS USA INC., f.k.a.
Philip Morris Incorporated, et al.,

Defendants-Appellees.

_____

No. 02-11736
_____

D. C. Docket No. 01-02846 CV-FAM

THE REPUBLIC OF BELIZE,

Plaintiff-Appellant,

versus

PHILIP MORRIS COMPANIES, INC.,
PHILIP MORRIS USA INC, f.k.a.
Philip Morris Incorporated, et al.

Defendants-Appellees.

3

Appeals from the United States District Court
for the Southern District of Florida

**(August 14, 2003)**

Before EDMONDSON, Chief Judge, DUBINA, Circuit Judge, and HODGES*, District Judge.

DUBINA, Circuit Judge:

In this appeal, we address the issue of whether the revenue rule prevents a foreign sovereign from bringing suit in federal court for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO") involving schemes to avoid the sovereign's tax laws. This case is the consolidation of six separate appeals. The Republics of Belize, Honduras and Ecuador ("The Republics") brought claims against the Appellees ("Big Tobacco") for violations of RICO, as well as state and common law claims. The Republics now appeal the district court's order granting Big Tobacco's Rule 12(b)(6) motion to dismiss their claims based on the common law revenue rule. After reviewing the record and having the benefit of oral argument, we agree with the district court and hold that the revenue rule requires abstention from passing judgment on the

*Honorable Wm. Terrell Hodges, United States District Judge for the Middle District of Florida, sitting by designation.

Republics' claims. Accordingly, we affirm the district court's judgment of dismissal.

## I. BACKGROUND FACTS

The Republics make various claims regarding the facts underlying this case, but all of the claims follow a common pattern. All of the Republics tax tobacco products as a means of regulating smoking in their various countries and providing funds for anti-smoking activities. The Republics allege that Big Tobacco engaged in various illegal schemes to avoid paying these taxes.

The form of the schemes varied. Some of the schemes involved smuggling tobacco into the Republics to avoid the taxes and then laundering the resulting profits through various illegal money laundering channels. Others involved moving tobacco through free-trade zones and then selling it to drug smugglers, who presumably smuggled the tobacco into the Republics as part of their own money laundering operations. Regardless of the specific scheme employed, the Republics allege that all of the tobacco companies conspired in one way or another to evade the Republics' taxes in order to protect Big Tobacco's profits and lower

prices to consumers in the Republics in order to ensure that the taxes did not deter consumers from smoking.

All of Big Tobacco's alleged schemes, which form the predicate acts to the Republics' RICO claims, were targeted at avoiding the taxes the Republics placed on tobacco imported into their respective countries.

## II. STANDARD OF REVIEW

"We review a dismissal pursuant to Rule 12(b)(6) *de novo,* applying the same standard as the district court did." Hoffman-Pugh v. Ramsey, 312 F.3d 1222, 1225 (11th Cir. 2002).

## III. DISCUSSION

This case requires us to determine whether the revenue rule applies in this circuit and, if it does, whether it requires us to abstain from considering the civil RICO claims that the Republics brought to remedy Big Tobacco's schemes to avoid the Republics' taxes.

*A.* *The Revenue Rule*

The revenue rule is a long-standing common law rule that prevents the courts of one sovereign from enforcing or adjudicating tax claims from another sovereign.[1]  Although 18th century English courts originally developed the rule to protect British trade,[2] it has a long history of recognition and application in this country.[3] The rule was originally justified in England on the basis of nationalistic commercial protectionism,[4] but its application in this country is based and justified on the grounds of respect for sovereignty and the separation of powers.  Attorney Gen. of Canada, 268 F.3d at 109; Moore, 30 F.2d at 604 (applying the revenue rule in the context of an intra-state tax dispute). This circuit has not previously

---

[1]  Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103, 106 (2d Cir. 2001); Moore v. Mitchell, 30 F.2d 600, 603-604 (2d Cir. 1929) (Hand, J. concurring); Planche v. Fletcher, 99 Eng. Rep. 164, 165 (K.B. 1779) (Lord Mansfield) ("One nation does not take notice of the revenue laws of another."); Holman v. Johnson, 98 Eng. Rep. 1120, 1121 (K.B. 1775) (Lord Mansfield) ("no country ever takes notice of the revenue laws of another.").

[2]  See Barbara A. Silver, Modernizing the Revenue Rule: The Enforcement of Foreign Tax Judgments, 22 GA. J. of INT'L & COMP. L. 609, 613-616 (1992) (discussing the history of the revenue rule).

[3]  Attorney Gen. of Canada, 268 F.3d at 109-11; Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson, 597 F.2d 1161, 1164-65 (9th Cir. 1979); Moore, 300 F.2d at 603-604 (Hand, J. concurring); Ludlow v. Van Rensselaer, 1 Johns. 94 (N.Y. 1806).

[4]  Silver, supra note 2, at 613-616.

considered or adopted the rule. We now recognize the continuing vitality of the revenue rule, adopt it as the rule of this circuit and apply it to the facts of this case.

### 1. Substance over form

We initially recognize that it is the substance of a claim, not the form, that is important under the revenue rule. Attorney Gen. of Canada, 268 F.3d at 130 ("What matters is not the form of the action, but the substance of the claim."); United States v. Boots, 80 F.3d 580, 587 (1st Cir. 1996) ("Where a domestic court is effectively passing on the validity and operation of the revenue laws of a foreign country, the important concerns underlying the revenue rule are implicated."); see also United States v. Harden, [1963] S.C.R. 366, 372-373 (Can.); Sydney Mun. Counsel v. Bull, 1 K.B. 7 (1909). If it were otherwise, litigants could freely avoid the impact of the revenue rule by bringing tax claims under the guise of non-tax-related causes of action. That is precisely what the Republics are attempting to do here. We agree with the Second Circuit in rejecting this approach. See Attorney Gen. of Canada, 268 F.3d at 131 ("Canada would have a United States court require defendants to reimburse Canada for its unpaid taxes, plus a significant

penalty due to RICO's treble damages provision. Thus, Canada's object is clearly to recover allegedly unpaid taxes.").

The Republics' claims fundamentally deal with the adjudication of foreign tax claims. Although the Republics' frame their claims as civil RICO violations, their complaints make clear that Big Tobacco's schemes to avoid the Republics' tax laws is at the heart of all of their claims. Taking the Republics' allegations as true, all of their claims of wire fraud, mail fraud and money laundering involve schemes to avoid paying taxes and seek to collect these unpaid taxes.

The revenue rule applies whether the Republics seek to redress these alleged violations through civil RICO or direct tax claims. Attorney Gen. of Canada, 268 F.3d at 131, quoting United States v. Harden, [1963] S.C.R. 366, 372-373 (Can.) ("For the purpose of this case it is sufficient to say that when it appears to the court that the whole object of the suit is to collect tax for a foreign revenue, and that this will be the sole result of a decision in favour of the plaintiff, then a court is entitled to reject the claim by refusing jurisdiction."). Furthermore, the revenue rule applies regardless of whether the Republics frame their damages as the direct loss of tax revenue or the indirect effects of such lost revenue, such as increased law enforcement costs or increased costs of combating smoking. 1 Dicey & Morris, The Conflict of Laws 91 (13th ed. 2000) ("Indirect enforcement occurs

9

where a foreign State (or its nominee) in form seeks a remedy, not based on the foreign rule in question, but which in substance is designed to give it extra-territorial effect . . . ."); see Attorney Gen. of Canada, 268 F.3d at 130-33.

Therefore, we hold that the Republics' civil RICO claims implicate the revenue rule because, in substance, they seek redress for violations of the Republics' tax laws.

### 2. Respect for Sovereignty

"Tax laws embody a sovereign's political will. . . . They mirror the moral and social sensibilities of a society." Attorney Gen. of Canada, 268 F.3d at 111. The revenue rule exists to prevent the courts of a sovereign nation from enforcing policy choices of a foreign sovereign that might run counter to its own. Moore, 30 F.2d at 604 (Hand, J. concurring) ("No court ought to undertake an inquiry which it cannot prosecute without determining whether [another sovereign's] laws are consonant with its own notions of what is proper."); see also Attorney Gen. of Canada, 268 F.2d at 111-13. We find this justification for the revenue rule compelling.

The Republics' complaints make clear that their tax laws embody anti-smoking policies directed at protecting their citizens from the health hazards of

smoking, both by attempting to discourage smoking by raising the price of cigarettes and by providing revenue for anti-smoking programs. While we may personally applaud the Republics' efforts in this regard, it is not our role to promote these policies by enforcing their tax laws. Because the tax laws underlying the Republics' RICO claims embody specific policy choices, we hold that the revenue rule applies to these claims and prevents us from considering them.

The revenue rule also aims to promote harmony between sovereigns by preventing one sovereign from asserting its political will in another sovereign through actions to enforce its revenue laws. See Sabbatino, 376 U.S. at 448, 84 S.Ct. at 950-51 (White, J. dissenting) ("our courts customarily refuse to enforce the revenue and penal laws of a foreign state, since no country has an obligation to further the governmental interests of a foreign sovereign"); see also Attorney Gen. of Canada, 268 F.2d at 111-13. The Republics' claims directly implicate this aspect of the revenue rule because they seek to use the RICO Act as a means of enforcing the tax laws that Big Tobacco allegedly violated. If we were to provide them with the relief they seek, we would be allowing them to assert their sovereign political will, as embodied in their tax laws, in our country. This is precisely what the revenue rule exists to prevent.

We recognize that the respect for sovereignty justification for the revenue rule is not absolute because, as discussed below, the legislative and executive branches ("the political branches") of our government have the power under the Constitution to allow foreign sovereigns to enforce their policies, such as those embodied in the Republics' tax laws, in our country. See infra Part III.1.C (discussing the separation of power justification for the revenue rule). If the political branches were to make such an allowance, this justification for the revenue rule would disappear completely and we would have the authority to consider claims such as those brought by the Republics. However, as discussed below, the political branches have made no such allowance; and, thus, this justification for the revenue rule remains intact and requires us to abstain from considering the Republics' claims.

*3. Separation of Powers*

Although the revenue rule developed as a prudential common law doctrine,[5] we recognize that it has taken on constitutional significance based on the separation of powers in the Constitution. Under the Constitution, the power to

---

[5] See Silver, supra note 2, at 613-616.

12

conduct foreign relations is allocated to the political branches. Baker v. Carr, 369 U.S. 186, 212 n.31, 82 S. Ct. 691, 707 n.31, 7 L. Ed. 2d 663 (1962); Oetjen v. Cent. Leather Co., 246 U.S. 297, 302, 38 S. Ct. 309, 311, 62 L. Ed. 726 (1918). While the Constitution commits issues of foreign relations to the political branches, the judiciary may consider and pass judgment on a claim that touches an issue of foreign relations where the political branches have taken prior action on that issue. See Vermilya-Brown Co. v. Connell, 335 U.S. 377, 380, 69 S. Ct. 140, 142, 93 L. Ed. 76 (1948) (holding that where there was prior action by the political branches, the judiciary was able to pass judgment on the application of the Fair Labor Standards Act to a foreign geographical area even though the initial determination of the sovereignty of such foreign areas rested with the political branches).

"Extraterritorial tax enforcement directly implicates relations between our country and other sovereign nations," Attorney Gen. of Canada, 268 F.3d at 114, primarily because tax laws are regarded as embodying a nation's social and political policy choices. Id. at 111. Therefore, questions regarding whether and to what extent the federal government should provide for the enforcement of foreign tax laws in domestic courts are necessarily allocated to the political branches for resolution.

13

Furthermore, "with regard to the domestic collection of foreign taxes and the enforcement of United States taxes abroad, the political branches of our government have consistently acted on behalf of the United States in establishing and managing the nation's relationships with other countries."[6] Id. at 115. We recognize that in so acting, the political branches have expressed a "continuing policy preference against enforcing foreign tax laws . . . ." Id. at 118.

The political branches undisputedly have not entered into any type of tax treaty with any of the Republics that would allow the Republics to enforce their tax claims underlying this suit in this country. Furthermore, the political branches have not legislatively abrogated application of the revenue rule to RICO claims. See infra Parts III.2-3. Until such time as the political branches take action in favor of allowing extraterritorial enforcement of unadjudicated foreign tax claims in domestic courts, we lack the constitutional authority to consider such claims.

*B.*     *The revenue rule and the RICO Act*

---

[6] For a discussion of the history of foreign tax treaties see Attorney Gen. of Canada, 268 F.3d at 115-20.

The Republics next argue that even if the revenue rule applies in this circuit, RICO preempts it.  The essence of the Republics' argument is that the civil RICO statute impliedly preempts the revenue rule because its broad and plain language[7] does not contain an exception for cases involving foreign tax claims.  We are not persuaded by this argument because it misapprehends basic rules of statutory interpretation.

"Congress is understood to legislate against a background of common-law adjudicatory principles." Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 108, 111 S. Ct. 2166, 2169, 115 L. Ed. 2d 96 (1991).  "Thus, where a common-law principle is well established . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except 'when a statutory purpose to the contrary is evident.'" Id., 501 U.S. at 108, 111 S. Ct. at 2169-70 (quoting Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783, 72 S. Ct. 1011, 1014, 96 L. Ed. 1294 (1952)).  "Statutes which invade the common law . . .

---

[7] Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

18 U.S.C. § 1964(c).

are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." Isbrandtsen, 343 U.S. at 783, 72 S. Ct. at 1014. "In order to abrogate [such] a common-law principle, the statute must 'speak directly' to the question addressed by the common law." United States v. Texas, 507 U.S. 529, 534, 113 S. Ct. 1631, 1634, 123 L. Ed. 245 (1993).

Little question exists that the revenue rule is a "long-established and familiar principle."[8] See Attorney Gen. of Canada, 268 F.3d at 111-12 (detailing the history of the revenue rule). The RICO act does not "speak directly" to the applicability or inapplicability of the revenue rule to actions brought under it. Furthermore, the Republics have not demonstrated, nor has this court discovered, any evidence of a statutory purpose in the RICO statute that would except actions brought under it from the strictures of the revenue rule. Without such a showing, we presume that Congress originally passed, and subsequently amended, the RICO statute "against a background of common-law adjudicatory principles" that included the revenue rule "with an expectation that the principle [would] apply."[9] Therefore, the mere fact that the RICO statute is written in broad terms does not,

---

[8] Isbrandtsen, 343 U.S. at 783, 72 S. Ct. at 1014.

[9] Astoria Fed. Sav. & Loan Ass'n, 501 U.S. at 108, 111 S. Ct. at 2169-70

16

standing alone, preempt application of the revenue rule to the Republics' RICO claims.

## C.     *The revenue rule and the Patriot Act*

The Republics next argue that portions of the recently enacted Patriot Act, USA Patriot Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001), which amended the RICO statute, preempt application of the revenue rule to RICO claims.  They argue that the deletion of a rule of construction,[10] which would have codified the holding of <u>Attorney General of Canada</u>, from the final act demonstrates sufficient legislative intent to abrogate application of the revenue rule to RICO claims such as those brought by the Republics.  To support this position, the Republics point to statements by various Senators and Representatives indicating that this rule of construction was deleted specifically so

---

[10]      RULE OF CONSTRUCTION. - None of the changes or amendments made by the Financial Anti-Terrorism Act of 2001 shall expand the jurisdiction of any Federal or State court over any civil action or claim for monetary damages for the nonpayment of taxes or duties under the revenue laws of a foreign state, or any political subdivision thereof, except as such actions or claims are authorized by United States treaty that provides the United States and its political subdivisions with reciprocal rights to pursue such actions or claims in the courts of the foreign state and its political subdivisions.

147 CON. REC. H6925 (daily ed. Oct. 17, 2001)

17

as not to exempt Big Tobacco from claims such as those that the Republics bring in this case.[11]

We are not persuaded by this argument because the Republics are attempting to rely on a failed legislative proposal to show that Congress intended to abrogate a common law rule. The Supreme Court has held that the failure of a legislative proposal does not show that Congress endorsed the opposite proposition. United States v. Estate of Romani, 523 U.S. 517, 534, 118 S. Ct. 1478, 1488, 140 L. Ed. 2d. 710 (1998). As Justice Scalia explained, "Congress can no more express its will by not legislating than an individual Member can express his will by not voting." Id., 523 U.S. at 536, 118 S. Ct. at 1489 (Scalia, J. concurring). Under the U.S. Constitution, the only actions of Congress that have legally operative effect are those acts that are passed by both the House and Senate and are either signed by the President or repassed by a supermajority vote to break a presidential veto. U.S. CONST. ART. 1, § 7; Estate of Romani, 523 U.S. at 535-

---

[11] 147 CONG. REC. H7159 (daily ed. Oct. 23, 2001) (statement of Rep. Conyers) (noting that the conference "[d]ropped [a] provision carving out tobacco companies from RICO liability for foreign excise taxes"); 147 CONG. REC. E1936-02 (daily ed. Oct. 29, 2001) (statement of Rep. Wexler) ("I am pleased that a provision earlier included in money laundering legislation, which would have inhibited RICO liability for foreign excise taxes for tobacco companies, has been dropped from the USA PATRIOT Act of 2001 . . ."); 147 CONG. REC. S10990-02 (daily ed. Oct. 25, 2001) (statement of Sen. Kerry) ("today [we] clarify that it is the intent of the legislature that our allies will have access to our courts and the use of our laws if they are the victims of smuggling, fraud, money laundering, or terrorism.").

36, 118 S. Ct. at 1488-89. Under this scheme, failed legislative proposals have no operative effect because they do not satisfy the bicameralism and presidential signature or veto override requirements. To give effect to such proposals would invest Congress with legislative power far beyond what the Constitution provides because Congress could shape the meaning of the law by merely introducing a proposal, removing it and having individual legislators comment on the motivation behind its removal. As Justice Scalia explained, "The act of refusing to enact a law . . . has utterly no legal effect, and thus has utterly no place in a serious discussion of the law." 523 U.S. at 535, 118 S. Ct. at 1488 (Scalia, J. concurring).

Furthermore, the legislative process is inherently political, and action taken by Congress on a specific proposal, whether positive or negative, is often the result of compromise between various competing political forces and interests. While certain Senators and Representatives might state one motivation for taking action on such a proposal, such statements do not necessarily capture the full and accurate picture of the political process underlying the proposal's fate. Given the myriad of potential reasons behind a proposal's failure, we would be wading into very dangerous waters if we were to accord legally operative effect to a failed legislative proposal based on statements made by a handful of legislators.

Therefore, we follow Estate of Romani and look only to those portions of the Patriot Act that Congress passed and the President signed to determine whether the Patriot Act had any effect on the revenue rule in the context of civil RICO actions. After reviewing the same, we hold that the Patriot Act had no effect on the revenue rule's applicability to civil RICO actions and, therefore, the Republics' argument on this issue is without merit.

## IV. CONCLUSION

For the foregoing reasons, we adopt the revenue rule as the law of this circuit. We also hold that the revenue rule requires this court to abstain from considering the Republics' claims because, not to do so, would necessarily require us to pass judgment on unadjudicated foreign tax claims for which the political branches of our government have not provided an enforcement mechanism. Finally, we hold that neither the RICO Act nor the Patriot Act altered the application of the revenue rule to such claims. Accordingly, we affirm the judgment of the district court dismissing the Republics' claims.

AFFIRMED.