[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 30, 2004
THOMAS K. KAHN
CLERK

No. 02-16215

D.C. Docket No. 2:01-cv-251-FtM-29DNF

NICHOLAS La GRASTA,
DOMENICO La GRASTA, and
MAURO La GRASTA, on behalf of
themselves all others similarly situated,

Plaintiffs-Appellants,

versus

FIRST UNION SECURITIES, INC.,

Defendant-Appellee.

Appeal from the United States District Court
for the Middle District of Florida

**(January 30, 2004)**

Before BLACK and FAY, Circuit Judges, and JORDAN*, District Judge.

JORDAN, District Judge:

---

* Honorable Adalberto Jordan, United States District Judge for the Southern District of Florida,
sitting by designation.

In this securities fraud class action against First Union Securities, Inc., investors who purchased the stock of Ask Jeeves, Inc., an online internet research company, claimed that First Union's analyst, through her "strong buy" recommendations, inflated the price of Ask Jeeves shares while acting under an undisclosed conflict of interest. This conflict, it was alleged, consisted of First Union and its analyst trying to obtain investment banking business from Ask Jeeves at the same time that they were supposed to be providing unbiased analysis on the company and its stock. According to the investors, this undisclosed conflict caused the analyst to tout the stock so that First Union would be looked upon favorably when Ask Jeeves decided who was going to get its investment banking business, and violated § 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, codified at 17 C.F.R. § 240.10b-5.

First Union asked the district court to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing in part that the securities fraud claim was time-barred and that the investors failed to sufficiently allege loss causation. The district court dismissed the complaint on statute of limitations grounds, concluding that the investors -- who had purchased the stock at prices ranging from $78 to $134 per share -- were on inquiry notice of securities fraud when the stock dropped to $24 per share. Given its ruling on the statute of limitations issue, the district court did not

2

address First Union's loss causation argument.

We reverse. We conclude that the complaint was not time-barred on its face, and remand so that the district court can, in the first instance, address the issue of loss causation.

**I**

Like the district court, we accept the complaint's well-pleaded factual allegations, which are set out below. *See, e.g., Papasan v. Allain*, 478 U.S. 265, 283 (1986); *Marsh v. Butler County*, 268 F.3d 1014, 1023 (11th Cir. 2001) (*en banc*). But because the complaint lists the price of Ask Jeeves stock on only certain days during the relevant period, we will take judicial notice, pursuant to Federal Rule of Evidence 201(b), of the price of the stock on other days during this period. Those prices are not subject to reasonable dispute, and are a proper subject for judicial notice. *See, e.g., In re NAHC, Inc. Securities Litigation*, 306 F.3d 1314, 1331 (3rd Cir. 2002) (taking judicial notice of stock prices in securities fraud action); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n.8 (2nd Cir. 2000) (same).[1]

**A**

Research analysts who study publicly traded companies and make

---

[1]Unless otherwise noted, all references are to the per share closing prices of Ask Jeeves stock, adjusted for dividends and stock splits.

3

recommendations on the securities of those companies exert considerable influence in the marketplace. The reports and/or recommendations of such analysts can influence the price of a company's stock even when nothing about the company's prospects or fundamentals have changed.

Carolyn Trabuco, who worked for First Union, was one of these research analysts. She covered internet companies, including Ask Jeeves, whose stock was traded on the NASDAQ exchange. From November 18, 1999, until November 21, 2000, Ms. Trabuco prepared and issued research reports on Ask Jeeves.

Ask Jeeves began trading on July 1, 1999, and closed at $64.94 that day. During the next 30 days, the stock fluctuated between a low of $41.56 and a high of $72.00. On August 2, 1999, the closing price dropped to $41.00 per share. For most of August of 1999, the stock hovered at around $30.00, and on September 2, 1999, the price was $31.12. On October 1, 1999, the stock closed at $32.94, but thereafter began making significant gains. By November 1, 1999, the price had shot up to $83.31, an increase of about 150% in one month. The stock kept climbing in November of 1999, breaking the $100 barrier on November 4 at $116.75. On November 17, 1999, the day before Ms. Trabuco issued her first research report on Ask Jeeves, the stock reached a high of $190.50, and closed at $171.00.

On November 18, 1999, in her first report on the company, Ms. Trabuco made

4

a "strong buy" recommendation for Ask Jeeves stock and provided a target price of $230.00 per share. That day the stock closed at $172.75, up $1.75.

Nicolas and Mauro La Grasta -- who were First Union customers -- bought Ask Jeeves stock based upon Ms. Trabuco's reports. In December of 1999, Nicolas bought 1,000 shares at $134.88 per share, and Mauro bought 1,000 shares at $124.68 per share. At the time of these purchases, the stock price had already dropped about $55-$65 per share from the high of $190.50.

In January of 2000, First Union added Ask Jeeves to its "Analyst Action List" and named the stock as its top pick for internet content providers in 2000. First Union widely disseminated press releases "to ensure that its top stock pick was known to all market participants." Shortly thereafter, Domenico La Grasta -- a Merrill Lynch customer -- bought 500 shares of Ask Jeeves at $93.00 per share. By the time of Domenico's purchase, the stock had dropped $97 per share -- a more than 50% decrease -- from its high of $190.50 the day before Ms. Trabuco's first report.

That same month, Ms. Trabuco and First Union learned from the chief financial officer of Ask Jeeves that the company was considering a secondary public offering of its shares and was interested in retaining First Union. Ms. Trabuco and First Union continued to maintain the "strong buy" recommendations and high rating for Ask Jeeves stock in the hope that its investment banking business could be secured. In

5

seeking to generate investment banking profits, First Union encouraged Ms. Trabuco to ignore her obligations as an analyst and promote Ask Jeeves. In other words, Ms. Trabuco's goal was to "identify, and position those companies First Union believed would be capable of generating significant investment banking fees." Whether or not a company like Ask Jeeves "would be a long-term winner in its respective industry" was, at best, a secondary concern. Ms. Trabuco -- whose compensation was based in part on her ability to refer investment banking business -- and First Union had an incentive to issue "strong buy" recommendations for Ask Jeeves stock; the higher the price of the stock, the higher the fees that could be generated from an Ask Jeeves stock offering.

First Union did not disclose these matters in its reports. First Union also did not disclose any brokerage commissions it was paid (as Ms. Trabuco's employer) for sales and purchases of Ask Jeeves stock, actual or potential compensation to Ms. Trabuco based on investment deals she landed or the profitability of First Union's investment banking division, or any ownership interests in Ask Jeeves held by Ms. Trabuco, First Union, or First Union employees.

In February of 2000, while First Union continued to recommend Ask Jeeves as a "strong buy," Nicolas bought 200 more shares at $89.75 per share, and Mauro bought 1000 more shares at $78.00 per share. That same month, Ask Jeeves filed a

$150 million secondary stock offering.  Ask Jeeves did not, however, choose First Union as one of its underwriters.[2]

**B**

The price of Ask Jeeves shares did not rise as Ms. Trabuco had predicted in early 2000.  In fact, the stock continued to decline.  By March 1, 2000, the price had fallen to $77.75, and by April 3, 2000, it was down to $55.00.  Nevertheless, First Union issued biweekly reports with "strong buy" recommendations and price targets "significantly higher" than the prevailing market price of the shares.

On April 7, 2000, the stock reached what would be a monthly high of $56.25. Over the next 21 days, the price fell:

| Date | Price | Volume |
|---|---|---|
| April 10 | $50.06 | 670,400 |
| April 11 | $44.50 | 714,900 |
| April 12 | $39.50 | 532,800 |
| April 13 | $35.31 | 519,700 |
| April 14 | $27.69 | 1,500,000 |
| April 17 | $24.06 | 1,131,500 |
| April 18 | $28.00 | 1,280,600 |
| April 19 | $30.94 | 1,706,500 |
| April 20 | $29.38 | 466,200 |
| April 24 | $25.37 | 468,000 |
| April 25 | $28.50 | 413,400 |
| April 26 | $27.00 | 358,300 |

---

[2]The date of the secondary stock offering is taken from the *Smart Money* article quoted in the complaint.

April 28      $30.38        912,800

Until April 18, 2000, Ms. Trabuco reiterated her "strong buy" recommendation for Ask Jeeves and maintained her target price at $230.00 per share. The low for the stock during April of 2000 was $23.75 on April 23. On May 1, 2000, the stock rebounded, rising more than 50% from the April low to $37.75, but then resumed its slide, dropping to $20.87 on June 1, 2000.

In June of 2000, *Smart Money* magazine published an article entitled "Wall Street Firms Count on their Stock Analysts for Many Things -- But Independent, Incisive Research Isn't Exactly High on the List Right Now." The article featured Ms. Trabuco and her coverage of Ask Jeeves, and disclosed that, since January of 2000, First Union had been "in the running" to be selected as the underwriter for Ask Jeeves' secondary stock offering, with a "potential seven-figure payday." When Ask Jeeves filed a secondary stock offering of $150 million in February of 2000, however, it did not select First Union as an underwriter. The article also explained that analysts like Ms. Trabuco had base salaries of $100,000-$200,000, with their bonuses determined by "how much trading they bring for the sales force and, more important, how much business they generate for the firm's investment bankers." On the conflict of interest issue, Ms. Trabuco said the following in the article: "I've got three different hats to wear. There's the research, but then there's the banking and

8

marketing. I've got an obligation to all three . . . . You have to pay the bills."

In July of 2000, following the publication of the *Smart Money* article, the price of Ask Jeeves stock stayed between $14.00 (July 11) and $21.44 (July 26). In August of 2000, the stock had a low of $17.31 (August 2) and a high of $28.00 (August 30). In September of 2000, the price fluctuated between $17.06 (September 27) and $32.25 (September 5). First Union published Ms. Trabuco's final "strong buy" recommendation on October 25, 2000. On that day, the stock closed at $10.75.

First Union fired Ms. Trabuco on November 21, 2000. The price of Ask Jeeves stock was by then at $12.00. Each of the La Grastas sold their shares of Ask Jeeves stock at a loss after Ms. Trabuco's termination. Nicolas lost around $130,000, Mauro about $200,000, and Domenico approximately $85,000.

At no time did First Union correct any of Ms. Trabuco's reports, or change or modify the "strong buy" recommendations. Instead, First Union suspended coverage of Ask Jeeves. By late December of 2000, Ask Jeeves' stock was at $2.00.

## C

The omissions and misrepresentations on which the La Grastas base their securities fraud claim arise from the attempt by Ms. Trabuco and First Union to secure Ask Jeeves' investment banking business. According to the La Grastas, Ms. Trabuco and First Union failed to disclose their conflict of interest, and the campaign

9

to land the investment banking business led Ms. Trabuco to issue "strong buy" recommendations and a $230.00 per share target price which "did not reflect the true, unbiased opinion" of the value of the stock. First Union intended that Ms. Trabuco's reports would be relied upon by investors, and that the "result would be the artificial inflation of the price of Ask Jeeves [shares] and the creation of a false market demand" for the stock. The La Grastas do not allege that Ms. Trabuco and First Union omitted any other material facts, or made any other material misrepresentations, about Ask Jeeves in the reports.

## II

The district court's order of dismissal is subject to plenary review, and we apply the same standard employed below. *See, e.g., Republic of Honduras v. Phillip Morris Companies, Inc.*, 341 F.3d 1253, 1256 (11th Cir. 2003). That standard is by now a familiar one. A complaint should be dismissed only if it appears beyond doubt that the plaintiffs can prove no set of facts which would entitle them to relief. *See, e.g., Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

We must "view the allegations of the complaint in the light most favorable to the plaintiff[s], consider the allegations of the complaint as true, and accept all reasonable inferences therefrom." *Omar v. Lindsey*, 334 F.3d 1246, 1247 (11th Cir. 2003). In analyzing the sufficiency of the complaint, we limit our consideration to

10

the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed. *See* Fed.R.Civ.P. 10(c); *Harris v. Ivax*, 182 F.3d 799, 802 & n.2 (11th Cir. 1999).

### III

A statute of limitations bar is "an affirmative defense, and . . . plaintiff[s] [are] not required to negate an affirmative defense in [their] complaint." *Treganza v. Great American Communications Co.*, 12 F.3d 717, 718 (7th Cir. 1993). Not surprisingly, our cases say that a Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is "apparent from the face of the complaint" that the claim is time-barred. *See Omar*, 334 F.3d at 1251; *Carmichael v. Nissan Motors Acceptance Corp.*, 291 F.3d 1278, 1279 (11th Cir. 2002). *Accord In re Southeast Banking Corp.*, 69 F.3d 1539, 1551 (11th Cir. 1995) ("[F]or better or worse, the Federal Rules of Civil Procedure do not permit district courts to impose upon plaintiffs the burden to plead with the greatest specificity they can." ).

A cause of action for securities fraud under § 10(b) of the Act and Rule 10b-5 must be brought within one year of "discovery of the facts constituting the violation." *Theoharous v. Fong*, 256 F.3d 1219, 1228 (11th Cir. 2001) (quoting *Lampf, Pleva, Lipkind, Prupis, & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991)). In this circuit, discovery occurs "when a potential plaintiff has inquiry or actual notice of a

violation." *Theoharous*, 256 F.3d at 1228 (internal quotation marks and citation omitted). Inquiry notice, in turn, is "the term used for knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed." *Id.* (internal quotation mark and citation omitted). A potential plaintiff "need not . . . have fully discovered the nature and extent of the fraud before [he was] on notice that something may have been amiss. Inquiry notice is triggered by evidence of the *possibility* of fraud, not full exposition of the scam itself." *Id*. (citation omitted). *Accord Franze v. Equitable Assurance*, 296 F.3d 1250, 1254 (11th Cir. 2002) (applying *Theoharous* formulation of inquiry notice, and explaining that the focus is on the "reasonable person").

## A

The complaint in this case was filed on May 14, 2001. The district court concluded that the La Grastas were on inquiry notice of the alleged fraud by April of 2000, when the price of the stock dropped to $24.00:

> By April [of] 2000, the stock was selling at $24.00 per share. The court finds that an objectively reasonable person was on inquiry notice since at least April [of] 2000 of facts that would lead him or her to begin investigating the possibility that their legal rights had been infringed by First Union's continued "strong buy" recommendations. The steady and profound decrease in the price of the stock, when compared to the consistently optimistic "strong buy" reports, was ample to trigger knowledge of the possibility of fraud.

We disagree with the district court's conclusion. From the face of the complaint, the earliest that the La Grastas were on inquiry notice was June of 2000, when the *Smart Money* article was published, and so the complaint was filed within the one-year limitations period.

Because the district court's dismissal was based solely on the decline of Ask Jeeves stock, we begin our analysis with *Summer v. Land & Leisure, Inc.*, 664 F.2d 965 (5th Cir. Unit B 1981),[3] a case in which we reversed a district court's Rule 12(b)(6) dismissal of § 10(b) claims on statute of limitations grounds. Although *Summer* was decided prior to our express adoption of the inquiry notice standard articulated in *Lampf*, we used a comparable notice standard -- whether the plaintiff had "knowledge of facts which should have led to his discovery of the fraud." *Id*. at 970. With respect to the district court's reliance on the drop in stock price, we explained in *Summer* that we could "conceive of several factual situations in which a price decline, under the circumstances here, would not be indicative of fraud in the least, e.g., a depressed real estate market caused either by tight money or recession." *Id*. at 969.

The reasoning of *Summers* is sound, and we see no basis for deviating from

---

[3]As a Unit B decision of the former Fifth Circuit handed down after September 30, 1981, *Summers* is binding precedent in the Eleventh Circuit under *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

that reasoning in this case. There may be numerous reasons, other than fraud, for a stock to decline (even steeply) in price. *See LaSalle v. Medco Research, Inc.*, 54 F.3d 443, 446 (7th Cir. 1995) (declining to find that a big drop in price is notice per se of the possibility of securities fraud in light of other circumstances, such as the stock's history of volatility); *Gray v. First Winthrop Corp.*, 82 F.3d 877, 881 (9th Cir. 1996) ("It is well-settled that poor financial performance, standing alone, does not necessarily suggest fraud at the time of sale, but could also be explained by poor management, general market conditions, or other events unrelated to fraud, creating a jury question on inquiry notice."). For the reasons which follow, the price drop in April of 2000 was not enough for the district court to conclude that the La Grastas' complaint was time-barred.

First, to state the obvious, the stock market -- where risk is inherent -- is not a place for those who are faint of heart or weak of stomach. Individuals who put their money in equities in the hope of garnering great returns do not have the peace of mind provided by FDIC insurance, and must be willing to live with fluctuations in the value of their investments.

Second, the stock of Ask Jeeves was highly volatile. It started trading at $64.94 on July 1, 1999, and in just two months -- before Ms. Trabuco began analyzing the stock -- lost more than 50% of its value by falling to $31.12. Then, in

14

the next two and half months -- again before Ms. Trabuco issued any reports -- the stock realized an incredible gain of 500%, reaching a high of $190.50 on November 17, 1999.

Third, without knowing more, it is possible that the price drop to $24.00 resulted from reasons other than fraud. On this bare record, there are various unanswered questions which might shed light on the issue of inquiry notice, and it would be improper at this stage to assume that they would be answered adversely to the La Grastas. Why did the stock rise so quickly in October and November of 1999? Was there a rational, economic explanation for the spike in the price, or was it based on speculative trends (irrational exuberance, as some have put it) or impulsive buying in a bubble market? How was Ask Jeeves doing financially? Had the company issued reassuring statements to explain its prospects or the subsequent decline in stock price?[4] What were other analysts saying about the company's prospects? Was there volatility in the internet sector during the relevant time period? What was

---

[4] We decline to address First Union's assertion that the disclosures in Ask Jeeves' SEC filings also triggered inquiry notice. Although we can judicially notice mandatory SEC filings for their contents (not for their truth), *see, e.g., Oxford Asset Management, Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002), First Union has waived the argument by failing to discuss it in its answer brief. First Union's reference to having made this argument before the district court in its statement of facts is not an adequate substitute for elaborating the merits of the argument on appeal. *See, e.g., Kelliher v. Veneman*, 313 F.3d 1270, 1274 n.3 (11th Cir. 2002) (where argument is mentioned in the summary of argument, but is not addressed on the merits, it is deemed waived); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 & n.6 (11th Cir. 1989) (where argument is referenced only in the statement of the case, it is deemed waived).

15

happening to the stock market, generally, and to the internet sector, specifically, during this period? How were Ask Jeeves' competitors doing? Was the price drop due to phenomena like the bursting of a bubble market?

Fourth, we do not know the investment profiles of the La Grastas or what, if anything, they were told (or knew) about Ask Jeeves. If the La Grastas were looking for relatively safe investments with modest growth, then a substantial price drop may have triggered inquiry notice. But if they invested in Ask Jeeves to hit the stock market home run (or double or triple) with a speculative investment, then such a drop may have been expected, or at least tolerated.

Fifth, the La Grastas are suing First Union, and not Ask Jeeves, for securities fraud. It may be that even if the price drop alerted them to possible fraud on the part of Ask Jeeves, it would not necessarily have alerted them to misconduct by First Union. Although our cases in other contexts allow for this possibility, *cf. Morton's Market v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 834 (11th Cir. 1999) (antitrust action) ("we are unwilling to say . . . as a matter of law" "that notice of one wrong by a defendant does not trigger a duty for potential plaintiffs to investigate all other potential wrongs the defendant might be committing"), we cannot conclusively say from the allegations of the complaint that the La Grastas had a duty to investigate First Union when they saw their Ask Jeeves stock fall to $24.00 in April of 2000.

16

This does not definitively mean that the La Grastas' complaint was timely filed; depending on what discovery reveals, the result at the summary judgment stage may or may not be the same. But on this record, it is not apparent on the face of the complaint that the securities fraud claim is time-barred. *See, e.g., LaSalle*, 54 F.3d at 447 ("A fuller factual inquiry might of course cast the critical facts in a more ominous light. If for example the stock price of [the defendant's] competitors rose or remained steady during the period when [the defendant's] stock price was losing half its value, this might be a reason to believe that fraud was afoot."). The most that we can conclude as a matter of law is that the La Grastas were on inquiry notice in June of 2000, when the *Smart Money* article disclosed the alleged conflict. *See Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 367 (7th Cir. 1997) (reversing district court's Rule 12(b)(6) dismissal: "Whether a plaintiff had sufficient facts to place him on inquiry notice of a claim for securities fraud . . . is a question of fact, and as such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)."). *Cf. Theoharous*, 256 F.3d at 1228-29 (company's announcement of financial trouble and bankruptcy sent strong signals to investors that the company's previous talk of solid financial health was inaccurate).

First Union relies on *Treganza*, 12 F.3d at 720, and *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239 (3d Cir. 2001), cases which held that falling stock

prices (*Treganza*) or distribution payments (*Mathews*) were the critical factors triggering inquiry notice of fraud. *See Treganza*, 12 F.3d at 720 (90% stock drop triggered inquiry notice that broker's representation that stock was undervalued was fraudulent); *Mathews*, 260 F.3d at 254 ("After the funds' net asset values fell over 30% and their distributions fell by over 60%, the appellants should have recognized that they were not the safe, conservative vehicles promised by [the brokerage firm].").  We are not persuaded.

Shortly after its decision in *Treganza*, the Seventh Circuit rejected the type of rule pressed by First Union. *See La Salle*, 54 F.3d at 446 (noting that *Treganza* was decided on summary judgment, and explaining that the defendants' argument that "a big decline in the price of a stock is notice per se of the possibility of securities fraud" is an "overread[ing] [of] *Treganza*").  We concur with the Seventh Circuit's observation in *La Salle*. A substantial and/or sudden price drop may be one of the relevant factors to arouse suspicion among investors; in the appropriate case, it may even be the primary factor.  But assuming we could fashion a numerical formula that would be workable across the spectrum of securities cases, we decline the invitation to adopt a bright-line rule that a certain price drop within a certain period of time constitutes inquiry notice as a matter of law.

Insofar as *Matthews* is concerned, that case involved investors who had been

18

told that the funds they invested in were safe and conservative. *Mathews*, 260 F.3d at 242. In such a situation, a steep decline in price might indeed trigger inquiry notice. But on this record there is nothing to indicate that Ask Jeeves was seen as a conservative, low-risk investment.

Nor are we moved to affirm by orders entered in *In re Merrill Lynch & Co. Research Reports Securities Litigation*, 273 F.Supp.2d 351 (S.D.N.Y. 2003), a multi-district litigation involving claims similar to those of the La Grastas: alleged securities fraud by internet stock analysts issuing "buy" recommendations and high target prices without disclosing their conflict of interests with the subject companies. The district court in *Merrill Lynch* dismissed the plaintiffs' complaints on various grounds, one of them being that the claims were barred by the one-year statute of limitations. *See id.* at 378-82; *In re Merrill Lynch & Co. Research Reports Securities Litigation*, 2003 WL 21920386, at *7-8 (S.D.N.Y. August 12, 2003) (denying motion for reconsideration); *In re Merrill Lynch & Co. Research Reports Securities Litigation*, 2003 WL 22451064, at *6 (S.D.N.Y. Oct. 29, 2003) (relating to second set of defendants). In its first two orders (dated June 30, 2003, and August 12, 2003), the district court in *Merrill Lynch* reasoned that investors were put on inquiry notice of the fraud by pointed and specific media reports exposing key elements of the plaintiffs' claims and by the defendants' issuance of "buy" ratings in the face of

substantial declines in the trading price of the stocks. *See* 273 F.Supp.2d at 380-81; 2003 WL 21920386, at \*7-8. Significantly, however, the district court's orders were based only partially on the dramatic decline in the price of the shares. In fact, most of the discussion on inquiry notice by the district court concerns the newspaper articles about the conflict of interest and similar information available in the public domain. *See* 273 F.Supp.2d at 378-81 (lengthy discussion of press reports concerning analyst's ratings); 2003 WL 21920386, at \*8 ("*As a final note*, the dramatic decline in the price of plaintiffs' shares in early 2000 also served to put them on notice of the alleged fraud.") (emphasis added). We view the *Merrill Lynch* orders as consistent with our own conclusion that, on the face of the complaint, the publication of the *Smart Money* article exposing the conflict of interest of First Union and Ms. Trabuco was the event which put the La Grastas on inquiry notice.

We understand that the district court in *Merrill Lynch* took judicial notice of almost a dozen newspaper and magazine articles dating from May of 1996 to June of 2000 to conclude that the "whole investment community" was on inquiry notice of investment banking conflicts of interests and allegedly inflated "buy" ratings in Wall Street's stock research of technology companies before April of 2000, *see* 2003 WL 21920386, at \*8, but we need not address whether such judicial notice was proper under our cases. *See Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997) (*en banc*)

20

(explaining that judicial notice is a "highly limited process," and declining to take judicial notice of the unofficial conduct of a public official based on newspaper accounts). First Union has never argued that the La Grastas were put on inquiry notice by any articles published in the press, and no such articles were attached to the complaint or presented to the district court below.

**B**

Without citing to any authority, First Union alternatively defends the district court's dismissal on the ground that the La Grastas were placed on actual notice of the possibility of fraud by First Union's disclosure of the alleged conflict of interest in the analyst reports themselves and in the brokerage customer agreements. We cannot agree.

The following language appeared in fine print at the end of each of Ms. Trabuco's reports:

> The information has been obtained or derived from sources believed by us to be reliable, but we do not represent that it is accurate or complete. Any opinion or estimates contained in this information constitute our judgment as of this date and are subject to change without notice. First Union Securities, Inc. ("FUSI"), or its affiliates may provide advice or may from time to time acquire, hold or sell a position in the securities mentioned herein.

The two-page customer agreements contained a similar, albeit more specific, disclosure:

21

> Customer understands that FUSI may from time to time provide investment advice regarding the advisability of the purchase or sale of securities in instances where First Union Capital Markets Corp. ("FUCMC"), a wholly-owned broker-dealer subsidiary of First Union Corporation or any other broker-dealer or bank subsidiary of First Union Corporation, participates as an underwriter or otherwise is financially interested in a primary or secondary distribution of securities or in instances where such affiliate acts as a market-maker or dealer.

First Union asserts that these disclosures -- specifically the language that First Union "may from time to time acquire, hold or sell a position" in securities as to which it renders advice, and that it "may from time to time provide investment advice regarding . . . securities" in instances in which a First Union entity "participates as an underwriter or otherwise is financially interested in a primary or secondary distribution of securities" -- gave actual notice of its economic interest in the distribution and underwriting of Ask Jeeves stock offerings.  First Union contends that because the reports were issued beginning in November of 1999, and because Nicholas received his customer agreement in December of 1999, the La Grastas had actual notice of the alleged fraud well before May 14, 2000.

We reject First Union's actual notice argument.  The disclosures in the analyst reports and customer agreements may have informed the La Grastas (and other investors) that First Union might seek to do business (including, we assume, investment banking business) with companies that it was covering, but these

disclosures are too general and ambiguous to provide a warning of the fraud alleged in the complaint: that the ratings, recommendations, and target prices in the reports were not based on Ms. Trabuco's unbiased real opinions, but were instead deliberate attempts to inflate the stock price and thereby attract Ask Jeeves' investment banking business. Borrowing from the "bespeaks caution" cases, which deal with forecasts or projections in offering documents, we conclude that First Union's disclaimers were mere "boilerplate." *See generally Saltzberg v. TM/Sterling/Austin Associates*, 45 F.3d 399, 400 (11th Cir. 1995); *In re Trump Casino Securities Litigation*, 7 F.3d 357, 371-72 (3d Cir. 1993). Simply put, the disclaimers were not explicit or specific as to the fraud alleged by the La Grastas, and therefore did not put them on actual notice. *See, e.g., In re Worldcom, Inc. Securities Litigation*, 2003 WL 21219049, at *34 (S.D.N.Y. May 19, 2003) (boilerplate disclosure in analyst reports that analyst's firm "may from time to time perform investment banking or other services for, or solicit investment banking or other business from, any company mentioned in this report" did not provide notice to the public of analyst's conflict of interest). In fact, the sentence preceding First Union's disclaimer in the reports states that "any opinion or estimates contained in this information constitute our judgment as of this date," thereby suggesting that the report reflected Ms. Trabuco's unbiased judgment of the value of the stock based on her research.

23

## C

On the face of the complaint, the La Grastas' securities fraud claim against First Union was not time-barred. The La Grastas did not have actual notice of the alleged fraud by virtue of First Union's purported disclaimers, and were not placed on inquiry notice of the alleged fraud prior to May 14, 2000. The district court therefore should not have dismissed the complaint on statute of limitations grounds.

## IV

First Union argued below that the La Grastas failed to sufficiently plead loss causation, but the district court did not have the occasion to reach the issue. Although First Union may defend the dismissal of the complaint on any ground urged below, *see, e.g., Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1218 n.11 (11th Cir. 1999), we exercise our discretion and decline to decide, in the first instance, whether the La Grastas adequately alleged loss causation.

On remand, we suggest that the district court consider the following issues when addressing loss causation. First, what effect, if any, did the passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, have on this circuit's loss causation precedent, as articulated in cases like *Bruschi v. Brown*, 876 F.2d 1526, 1530 (11th Cir. 1989), and *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1444-49 (11th Cir. 1997)? *See generally* D. Escoffery, *A*

*Winning Approach to Loss Causation Under Rule 10b-5 in Light of the Private Securities Litigation Reform Act of 1995,* 68 FORDHAM L. REV. 1781, 1799-1806, 1816-24 (2000) (discussing the direct causation, foreseeability, and materialization of the risk approaches on loss causation under the PSLRA). Second, does § 78u-4(b)(4) of the PSLRA change the traditional notice pleading standards for the now-codified element of loss causation? *See, e.g., Gebhardt v. Conagra Foods, Inc.*, 335 F.3d 824, 830 n.3 (8th Cir. 2003) (the PSLRA does not change the traditional pleading rules for materiality and loss causation); *Coates v. Heartland Wireless Communications, Inc.*, 26 F.Supp.2d 910, 923 (N.D. Texas 1998) ("the PSLRA does not alter the standards for pleading loss causation").

## V

The dismissal of the La Grastas' complaint on statute of limitations grounds is reversed, and the case is remanded for proceedings consistent with this opinion.[5]

REVERSED and REMANDED

---

[5]The district court is not limited to the loss causation issue on remand. Instead, it is free to consider any other arguments made by First Union in its motion to dismiss.